**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| ZoomEssence, Inc.,<br><br>                                    Plaintiff,<br><br>            v.<br><br>McCormick & Company, Inc., FONA International, LLC, and FONA Technologies, LLC,<br><br>                                    Defendants. | Case No.<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff ZoomEssence, Inc. ("ZoomEssence" or "Plaintiff") brings this Complaint against McCormick & Company, Inc. ("McCormick"), and its wholly owned subsidiaries FONA International, LLC ("FONA International") and FONA Technologies, LLC ("FONA Technologies," and together with predecessors and FONA International, "FONA") (collectively, "Defendants") and alleges as follows:

### NATURE OF THE ACTION

1.      ZoomEssence, a leading technology and flavor company, poured over a decade of work and tens of millions of dollars into developing "game chang[ing]"[1] technology that industry giants could not. Its "Zooming Technology,"[2] pioneered by physicist Dr. Charles Beetz, ZoomEssence's co-founder and longtime Chief Scientist, transforms liquids into powder at near-ambient temperatures. It is revolutionary.

---

[1]    MCCORMICK FONA, *TrueTaste*, at 2:19 (YouTube, Dec. 23, 2020), https://www.youtube.com/watch?v=Bpbqhe2aB8M [hereinafter *TrueTaste* Video].

[2]    "Zooming Technology" refers collectively to the conversion technology, the dried powder produced by the conversion technology, and all related proprietary information and know how.

2.      Across a wide array of industries and applications, using products and components in concentrated dry-powder form comes with massive advantages. Liquids are comparatively heavy, bulky, and volatile—and thus far more expensive (and often more dangerous) to produce, store, and transport. For these reasons, several industries have, for over a century, converted liquids to powder using a conventional "spray drying" process. Yet because spray drying applies extreme heat—up to 400° F—it comes with serious drawbacks: it damages sensitive ingredients, consumes enormous amounts of energy, and is only suited for active ingredients with elevated boiling points.

3.      ZoomEssence solved these longstanding problems, enabling manufacturers to preserve delicate ingredients, improve product yields, reduce usage rates, slash water and energy requirements, encapsulate active ingredients, and create powdered products that had never before *existed*. Zooming Technology promises to change the way things are made, stored, and transported—and to transform several multi-billion dollar industries.

4.      ZoomEssence's breakthrough has been widely heralded, including by the United States Department of Energy ("DOE"). With the aim of advancing American manufacturing competitiveness, the DOE awarded ZoomEssence a grant from its Advanced Manufacturing Office and selected it for an extraordinary partnership with Lawrence Livermore National Laboratory ("Livermore") that advanced Zooming Technology with "commercial and ultramodern" computational fluid dynamics methods (and Livermore's supercomputers).[3] Separately, the National Science Foundation has awarded ZoomEssence a series of Small Business

---

[3] *Targeting Energy-Intensive Water Evaporation Processes*, LAWRENCE LIVERMORE NAT'L LAB'Y, https://hpc4energyinnovation.llnl.gov/success-stories/improve-water-evaporation-processes.

Innovation Research grants, and the Kentucky Cabinet for Economic Development and the Public Service Enterprise Group have awarded grants of their own to ZoomEssence.

5.     The disruptive potential of Zooming Technology is vast. As the DOE has recognized, the technology can be applied "across the pharmaceuticals, chemicals, and food industries to replace heated spray drying and freeze drying," with applications spanning nutraceuticals, cosmetics, probiotics, vaccines, heat-sensitive pharmaceuticals, agricultural products, fine chemicals, coffee, and countless other products requiring—or benefitting from—conversion from liquid to powder form, with future applications possible in polymers and ceramics.[4]

6.     Some aspects of ZoomEssence's technology have been patented—dozens of issued patents cover those aspects of Zooming Technology. ZoomEssence maintains and protects other aspects of Zooming Technology as proprietary, highly sensitive trade secrets.

7.     ZoomEssence initially focused significant resources on applying its technology in the food-and-beverage industry, and in particular, in foods and beverages that incorporate formulated flavors. Today, ZoomEssence markets its Zooming Technology across several industries and also manufactures and sells dried-powder products containing encapsulated flavors—products of Zooming Technology—to customers worldwide. Defendants are direct competitors of ZoomEssence in the flavor and food-and-beverage industries.

8.     Defendants McCormick, the global, publicly traded spice and flavor conglomerate with $6 billion in annual revenue, and FONA, once a standalone flavor company

---

[4] U.S. DEP'T. OF ENERGY OFF. OF ENERGY EFFICIENCY & RENEWABLE ENERGY, LIQUIDS TO POWDERS WITHOUT HEAT—NO HEAT SPRAY DRYING TECHNOLOGY 1 (Dec. 2017), https://www.energy.gov/sites/prod/files/2017/12/f46/No%20Heat%20Spray%20Drying%20Technology_0.pdf.

and now a subsidiary of McCormick, stood to profit enormously if they could acquire access to Zooming Technology.

9.      FONA, in particular, recognized that Zooming Technology is, in FONA's words, "game chang[ing]."[5] It thus repeatedly approached ZoomEssence under the guise of exploring business transactions, which resulted in the parties entering into comprehensive NDAs under which ZoomEssence supplied FONA with highly sensitive proprietary information and trade secrets.

10.     Yet rather than pay for access to that technology, FONA resorted to out-and-out theft: it stole ZoomEssence's trade secrets and is willfully infringing ZoomEssence's patents. FONA's misconduct paid immediate dividends—with FONA brazenly touting copycat technology as its own, FONA promptly sold itself to McCormick for $710 million. FONA's new parent, McCormick, continues to willfully infringe ZoomEssence's patents and to commercialize technology that was built on ZoomEssence's trade secrets and proprietary innovations developed across many years of research, development, investment, and ingenuity.

11.     This is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1, *et seq.*, including 35 U.S.C. § 271; and the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836, *et seq.*

12.     Defendants' accused "TrueTaste®" technology infringes at least two ZoomEssence patents and incorporates trade secrets misappropriated from ZoomEssence.

13.     McCormick has willfully infringed, continues to willfully infringe, has actively induced, and continues to induce others to infringe U.S. Patent No. 9,551,527 (the "'527 Patent") and U.S. Patent No. 9,332,776 (the "'776 Patent") (collectively, the "Asserted Patents").

---

[5] *TrueTaste* Video, *supra* note 1, at 2:19.

14.     All Defendants have misappropriated Plaintiff's confidential and proprietary information relating to Zooming Technology. Defendants' misappropriation was willful, malicious, and with reckless indifference to ZoomEssence's intellectual property rights.

15.     ZoomEssence sues to stop Defendants' unlawful acts and for damages and other relief.

**THE PARTIES**

16.     ZoomEssence, a technology and flavor company, is a Delaware corporation headquartered in Hebron, KY.

17.     McCormick is an international spice company that sells a range of flavor solutions including herbs, spices, seasonings, sauces, and extracts. It is a Maryland corporation that operates through many places of business, with headquarters in Hunt Valley, MD.

18.     FONA is a flavor company that was acquired by McCormick in December 2020 and folded into the McCormick Flavor Solutions division, which now does business as "McCormick-FONA" and brands itself as "McFONA."[6] McFONA develops and manufactures flavoring extracts, syrups, powders, and other products for use in food and beverage products.[7]

19.     Upon information and belief, FONA International and FONA Technologies are limited liability companies and wholly owned subsidiaries of McCormick.

20.     Upon information and belief, after being acquired by McCormick, FONA International, Inc. and FONA Technologies, Inc. converted to FONA International, LLC and FONA Technologies, LLC, respectively.

---

[6] *McCormick Acquires FONA International, LLC*, PR NEWSWIRE (Dec. 30, 2020, 7:30 ET), https://www.prnewswire.com/news-releases/mccormick-acquires-fona-international-llc-301199312.html.
[7] *COMPANY: About FONA*, MCCORMICK FONA, https://www.mccormickfona.com/company (last visited Dec. 12, 2025).

## JURISDICTION

21.     Plaintiff's claims arise under federal law. The Court has subject matter jurisdiction over the patent infringement claims under 28 U.S.C. §§ 1331 and 1338(a). The trade secret misappropriation claim arises under the DTSA, and the Court has subject matter jurisdiction under 28 U.S.C. § 1331.

22.     The Court has personal jurisdiction over McCormick. McCormick has conducted and is conducting substantial business in the State of Texas and this District, both generally and with respect to the allegations in this Complaint. Among other things, McCormick has committed and continues to commit acts of patent infringement in the State of Texas and this District, giving rise to ZoomEssence's infringement claims, including making, having made, using, selling, and/or offering to sell the Accused Products in the State of Texas and this District; importing into the State of Texas and this District the Accused Products, either directly or through one of their wholly owned subsidiaries or agents; and/or inducing others to commit acts of patent infringement in the State of Texas and this District.

23.     McCormick is registered to do business in the State of Texas, has a Texas Taxpayer Number, and has a registered agent for service of process in Austin, Texas.

24.     McCormick has sufficient minimum contacts within Texas to establish personal jurisdiction. McCormick sells and/or offers to sell the Accused Products in the State of Texas and in this District, both directly and through the stream of commerce, by working with its wholly owned subsidiaries or agents, distributors, and/or other entities in the State of Texas.

25.     McCormick has purposefully placed infringing products into the stream of commerce with the expectation that they will be purchased and/or used by residents of the State of Texas and this District and/or incorporated into downstream products purchased by consumers in the State of Texas and this District, including by directly or indirectly working with its wholly

owned subsidiaries or agents, distributors, and other entities in the State of Texas to ensure their products reach the State of Texas and this District.

26.     McCormick derives substantial revenue from goods and services it sells to Texans.

27.     McCormick regularly sells and distributes its products, including spices, seasonings, and products with formulated flavors, to retailers and customers throughout Texas and this District. For instance, Wal-Mart Stores, Inc. is one of McCormick's largest customers, accounting for about 12% of McCormick's consumer sales.[8]

28.     McCormick offers its products for sale in retail stores located in this District, including at several Walmart locations.

29.     McCormick also sells its products directly to consumers in this District. Consumers may, for example, browse "Products" on McCormick's webpage to see what items are available for purchase and where.

---

[8]  MCCORMICK & CO., 2024 ANNUAL REPORT 16 (2025), https://ir.mccormick.com/static-files/4750d534-2be8-44b4-b9a3-0c5dc19da4d2 [hereinafter MCCORMICK 2024 ANNUAL REPORT].

30.     Upon clicking on a product, consumers can "Find a Retailer" nearby. Upon entering "Marshall, TX," consumers are shown that McCormick products, including Accused Products with formulated flavors, are for sale at least at the following locations:[9]



31.     Retailers' websites also confirm that McCormick products, including Accused Products with formulated flavors, are sold in this District. For example, Walmart's

---

[9] *McCormick® Grill Mates® Montreal Steak Seasoning, 3.4 oz*, MCCORMICK & CO., https://www.mccormick.com/products/mccormick-grill-mates-montreal-steak-seasoning-3-4-oz (last visited Dec. 12, 2025) (listing "Natural Flavor" among the product's ingredients).

website confirms that the Products are offered for sale and can be purchased at the Walmart located

at 1701 E End Blvd N, Marshall, TX 75670:[10]



32.     Super 1 Foods' website also confirms that McCormick products are offered

for sale and can be purchased at the Super 1 Foods location at 207 E End Blvd N, Marshall,

TX 75670:[11]



---

[10] *McCormick GRILL MATES Gluten Free Montreal Steak Seasoning, 3.4 oz Bottle*, WALMART, https://www.walmart.com/ip/McCormick-Grill-Mates-Gluten-Free-Montreal-Steak-Seasoning-3-4-oz-Bottle/10308051 (last visited Dec. 12, 2025).

[11] *Mccormick Grill Mates Montreal Steak Seasoning - 3.4 Ounce*, SUPER 1 FOODS, https://www.super1foods.com/sm/pickup/rsid/631/product/mccormick-grill-mates-montreal-steak-seasoning-34-ounce-id-00052100002453 (last visited Dec. 12, 2025).

33.    McCormick also maintains manufacturing properties in Texas, including a Flavor Solutions manufacturing facility on Century Circle in Irving, TX.[12]



34.    McCormick also continually directs substantial marketing and advertising efforts to Texas consumers through various channels, including its website, mccormick.com, which actively targets and serves, among others, Texas consumers.

35.    McCormick has, through its many business activities in and directed to Texas, including those related to its efforts to sell the Accused Products, purposefully availed itself of the benefits and protections offered by Texas and its laws.

---

[12] *See* MCCORMICK 2024 ANNUAL REPORT, *supra* note 8, at 29; *Directions to McCormick & Company*, IRVING-LAS COLINAS CHAMBER OF COMMERCE, https://local.irvingchamber.com/directory/results/directions.aspx?listingid=10830 (last visited Dec. 12, 2025); *see also 3300 Century Cir.*, GOOGLE MAPS, https://maps.app.goo.gl/Kis5wyU1NW5w2qXb8 [https://perma.cc/9XZU-VWC3] (last visited Dec. 12, 2025).

36.     This Court also has personal jurisdiction over FONA International and FONA Technologies, which are McCormick subsidiaries who conduct business as a single entity marketed as "McCormick Flavor Solutions" and "McCormick FONA" and/or "McFONA."[13]

37.     FONA International and FONA Technologies each sell and/or offer to sell the Accused Products in the State of Texas and this District directly and through the stream of commerce by working with their wholly owned subsidiaries or agents, distributors, and/or other entities in the State of Texas.

38.     McCormick, through FONA International and FONA Technologies, has purposefully and voluntarily placed one or more infringing products into the stream of commerce with the expectation that they will be purchased and/or used by residents of the State of Texas and this District and/or incorporated into downstream products purchased by consumers in the State of Texas and this District, including by directly or indirectly working with its wholly owned subsidiaries or agents, distributors, and other entities in the State of Texas to ensure their products reach the State of Texas and this District.

39.     Upon information and belief, FONA International and FONA Technologies derive additional substantial revenue for their parent company McCormick from goods and services they sell in Texas.

40.     Upon information and belief, FONA International and FONA Technologies are part of McCormick's Flavor Solutions Division.

41.     According to the 2024 McCormick Annual Report, PepsiCo, Inc. accounts for around 13% of the McCormick Flavor Division's annual consolidated sales.[14] Upon information and belief, PepsiCo is at home in Texas, where it maintains its Research and

---

[13] *See, e.g.*, MCCORMICK FONA, https://www.mccormickfona.com/ (last visited Dec. 12, 2025).
[14] MCCORMICK 2024 ANNUAL REPORT, *supra* note 8, at 16.

Development division, which is located at 7701 Legacy Dr., Plano, TX 75024. PepsiCo also maintains a "key headquarters" location in Plano, Texas.[15] FONA thus sells hundreds of millions of dollars of Accused Products to a company with key headquarters in Plano.

42.    FONA also offers courses and "special sessions" across the United States, including in Texas. Some courses and special sessions are offered virtually to students nationwide, including those in this District, and others are offered in person, including to those in this District. According to the McFONA website, FONA's Flavor 101 course offers "rock star faculty" who "come[] to YOU. . . You'll leave knowing how to work better with flavor – without ever leaving town."[16]

43.    An interested party could then click "Register For A Course Now" to be redirected to a sign-up page. This sign-up page includes a section inquiring about an interested party's flavor budget:[17]

## Purchasing Personnel

How much does your company spend on flavors each year?

| |
|---|

44.    FONA International and FONA Technologies have thus, through their several business activities in Texas, including those at issue in this litigation, established significant contact with Texas and purposefully availed themselves of the benefits and protections

---

[15]    *Locations*, PEPSICO CAREERS, https://www.pepsicojobs.com/main/our-locations/northamerica/unitedstates (last visited Dec. 12, 2025).

[16]    *Flavor 101® Hits the Road*, MCCORMICK FONA, https://www.mccormickfona.com/learn/flavor-university/flavor-101-hits-the-road (last visited Dec. 12, 2025).

[17]    *Register for Flavor University®*, MCCORMICK FONA, https://www.mccormickfona.com/contact-mccormick-flavor-solutions/register-for-flavor-university (last visited Dec. 12, 2025).

of its laws. FONA International and FONA Technologies each have sufficient minimum contacts with the State of Texas such that they are subject to specific personal jurisdiction for the matters asserted in this Complaint.

## VENUE

45.     This Court has patent venue over McCormick under 28 U.S.C. § 1400(b).

46.     First, McCormick committed and is committing infringing acts in Texas and this District, including making, using, offering for sale, and/or importing the Accused Products within this District, including by internet sales, inducing others to commit acts of patent infringement in this District, and/or committing at least a portion of any other infringements alleged herein in this District.

47.     Second, McCormick maintains a regular and established place of business in this District under 28 U.S.C. § 1400(b). Upon information and belief, McCormick either leases or *de facto* leases, under slotting and/or other contracts, certain dedicated shelf and floor space from large retailers to sell its products.[18]

48.     McCormick maintains large, physical, dedicated shelf-space areas stocked exclusively with McCormick products across a variety of large retailers. Each is styled with McCormick's distinctive branding and maintained by McCormick, its agents, or both.

49.     Upon information and belief, McCormick pays a premium for such dedicated shelf space, unlike other large foodstuffs companies. Indeed, McCormick's dedicated

---

[18] McCormick & Co., Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-K), at 7 (Nov. 30, 1999) ("In many of our markets, the Company has multi-year contracts with customers to secure the shelf space for our products."). McCormick has faced FTC challenges about the slotting contracts, through which it pays for retail shelf space, before. *See Analysis of Proposed Consent Order To Aid Public Comment*, FED. TRADE COMM'N, https://www.ftc.gov/sites/default/files/documents/cases/2000/03/mccormickanalysis.htm (last visited Dec. 12, 2025).

shelf space is akin to a leased area for a mall kiosk. Upon information and belief, McCormick has multi-year contracts with retailers to dedicated secure shelf space for its products. "McCormick's supply agreements with customers commonly include provisions that, as is sometimes seen with slotting allowances, restrict supermarket customers' ability to deal in the products of competing spice suppliers. Such provisions commonly require that the customer allocate to McCormick the large majority (as much as 90%) of the shelf space devoted to spice products."[19]

50.     Under McCormick's contracts with retailers, McCormick, on information and belief, controls and dictates the distinctive appearance of McCormick's shelf-space displays and standalone displays. The consistent and distinctive appearance of those displays is a key component of the company's retail strategy. As a large, sophisticated business in the worldwide foodstuffs market, McCormick places a high importance on ensuring a tight, uniform appearance across a diverse range of merchandisers, from national supermarket chains to regional grocers and independent specialty stores.[20]

51.     Much like a business renting space in a mall kiosk, under McCormick's contracts with retailers, McCormick, on information and belief, pays the retailer a fee periodically in return for space dedicated to the marketing and sale of McCormick products. McCormick ensures that consumers know exactly what McCormick's shelf area looks like. This establishes consumer habit: when shopping for spices, seasonings, and flavor products, the consumer may

---

[19] *Analysis of Proposed Consent Order To Aid Public Comment*, FED. TRADE COMM'N, https://www.ftc.gov/sites/default/files/documents/cases/2000/03/mccormickanalysis.htm    (last visited Dec. 12, 2025).

[20] *See, e.g.*, McCormick & Co., Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-K), at 82 (Jan. 10, 2010), https://ir.mccormick.com/static-files/304650c3-6a65-47e9-8378-879a5f3af456 ("[W]e remain acutely aware of the in-store display and merchandising of our products and have made great improvement in recent years with the introduction of gravity-fed shelving for our core spice and seasoning products. In addition, secondary displays of our products are particularly important during holiday periods.").

easily locate McCormick's products at a wide range of facilities simply by scanning for the familiar branded color scheme. Consumers expect, and McCormick ensures, that multiple McCormick spices, seasonings, and products with formulated flavors will be grouped together for easy access, eliminating the need to search through multiple brands' offerings for the desired product.

52.    For example, one of McCormick's well known and highly recognizable shelf displays involves red dividers separating individual products, with each divider containing a different spice or seasoning in McCormick's distinctive branded packaging. Above each spice or seasoning container is a specific, uniformly designed photograph of the product, along with the product's name displayed in McCormick's distinctive lettering, fonts, and brand colors. This standardized display format is carefully designed by McCormick to create immediate visual recognition and brand consistency across all retail locations. The overall aesthetic appearance is tightly controlled and prescribed by McCormick to ensure that consumers encounter the same visual experience regardless of which retail location they visit. Through these shelf displays, McCormick establishes a physical presence throughout retail locations in this District.

53.    Upon information and belief, McCormick ensures the placement and appearance of these shelf displays in at least two ways. First, retailers are contractually obliged to ensure that McCormick displays are fully stocked and conform to McCormick's exacting display specifications. Second, McCormick's U.S. Consumer Products Division performs retail audits to monitor the quality of in-store product displays managed by retail partners—*i.e.*, McCormick employees physically visit stores with McCormick displays to ensure compliance with McCormick's requirements and instructions and rectify any observed deficiencies:[21]

---

[21]    *McCormick & Co. Improves Retail Audit Execution*, FLOWFINITY, https://www.flowfinity.com/customers/retail-execution-case-study-mccormick.aspx (last visited Dec. 12, 2025).



54.     McCormick maintains such shelf space in and around the Eastern District of Texas, as shown in the following photographs:




55.     McCormick also maintains large, free-standing physical displays in retailers in this District.

56.     For example, during certain seasonal promotions, McCormick designs, provides, and maintains specific floor-based displays to promote and sell its products, including its lines of seasoning and spices, within this District. Such floor displays are created and designed by McCormick from cardboard and other materials, and are decorated with certain, seasonally

specific designs and themes, as well as prominent McCormick logos and branding to ensure immediate brand recognition by consumers. Upon information and belief, McCormick reserves and controls certain floor-based space at large retailers in this District in order to secure optimal, high-traffic locations within the stores for its promotional items and seasonal displays. Through these seasonal floor displays, McCormick establishes a physical presence throughout retail locations in this District. Below is an exemplary version of such floor displays:



57.     McCormick's design partner for these displays touts the displays' "rich gold tones and McCormick's signature red, by flood coating the side panels, helping to deliver brand recognition. The finished displays were delivered preassembled with products, which helped to streamline retailer setup":[22]

---

[22] *McCormick Spices Up the Baking Aisle with an Award-Winning Holiday Display*, SMURFIT WESTROCK, https://www.smurfitwestrock.com/innovation/customer-stories/mccormick (last visited Dec. 17, 2025).



58.    Due to the effectiveness of the displays, "McCormick expanded the festive Holiday design to additional retailers."[23]

59.    Further, on McCormick's Instagram page, McCormick advertises that "McCormick is spreading holiday cheer all over the world! Take a look at some of our global brands' holiday displays in international retail stores. Have you seen one of our festive displays in your local store? Snap a photo and tag us on social!" It then includes pictures of these floor displays across its worldwide retail locations, including the following picture:[24]

---

[23] *Id.*
[24] Image posted by McCormick & Company (@mccormickcorp), INSTAGRAM, *McCormick is spreading holiday cheer all over the world!* (Dec. 21, 2023), https://www.instagram.com/p/C1HjrTxriZ5/?img_index=2.



60.    In addition to holiday-themed floor displays, McCormick also provides other types of floor displays, including the following:[25]



61.    These displays "for [McCormick's] grilling collection" were placed "in Walmart stores across the nation."[26]

---

[25] *McCormick Spices Up the Baking Aisle with an Award-Winning Holiday Display*, SMURFIT WESTROCK, https://www.smurfitwestrock.com/innovation/customer-stories/mccormick (last visited Dec. 17, 2025).

[26] *McCormick Grilling Half Pallet Display*, SHOP!, https://shop.secure-platform.com/omaawards/gallery/rounds/138/details/27782 (last visited Dec. 17, 2025).

62.    McCormick actively advertises its floor displays on social media, including TikTok, Instagram, and Facebook, to drive consumer engagement. This strategy has proven effective in raising consumer awareness and driving consumers to visit retail locations because of McCormick's displays:[27]

 

63.    Third, McCormick controls agents physically located and regularly conducting business in this District. Upon information and belief, McCormick's Consumer Products Division carefully establishes the look and feel of its shelf displays. Rather than simply shipping its products to a retailer, McCormick actively directs how its products are displayed to

---

[27] FACEBOOK (Nov. 6, 2024),
https://www.facebook.com/groups/237920857699504/posts/1117922933032621; FACEBOOK,
https://www.facebook.com/groups/bestchristmascookieandcandyrecipes/posts/129994201145344
6 (last visited Dec. 17, 2025).

maintain the aesthetic integrity of its brand presence, and performs retailer-based audits to ensure compliance.[28] For example, upon information and belief, McCormick sends retailers kits containing the necessary pieces to assemble its displays.

64.     Upon information and belief, once McCormick ships the displays to retailers, McCormick's agents and/or employees build and arrange the displays per exacting instructions provided by McCormick. These instructions dictate every aspect of the display's appearance, from the precise placement of products to the overall aesthetic presentation, ensuring uniformity across all retail locations that sell McCormick's goods. McCormick further directs retailers' compliance through routine monitoring and audits of the displays, including retailer-based audits to ensure strict adherence to McCormick's brand standards. The retailers are not acting independently or on behalf of the store locations; rather, they function as McCormick's agents, carrying out McCormick's specific directives regarding how the products must be displayed. These retailers implement McCormick's detailed instructions, maintain McCormick's proscribed aesthetic standards, and report to McCormick regarding compliance and display conditions.

65.     Through this relationship, McCormick exercises direct control over its physical retail presence within the District, ensuring that each display serves as an extension of McCormick's business operations and reflects McCormick's exacting standards for brand and product presentation. This level of control and direction over the merchandisers establishes that these retailers are performing McCormick's business within this District, under McCormick's authority, and for McCormick's benefit.

---

[28] *See, e.g.*, *Spicing Up America and Transforming a Billion Dollar Brand*, JIMMY P BRANDED, https://jimmypbranded.com/mccormickcs (last visited Dec. 12, 2025).

66.    Whether by contract rights, market power, or otherwise, McCormick's direction and control over physical locations in the District contrasts with other sellers whose products are arranged on an *ad hoc* basis according to the wishes of the retailers.

67.    Thus, for the foregoing reasons, Venue in this District is proper as to McCormick under 28 U.S.C. § 1400(b).

68.    Venue is also proper as to all Defendants for Count 3 under 28 U.S.C. §§ 1391(b)(1) and (c)(2).

69.    All Defendants are subject to this Court's personal jurisdiction with respect to the civil actions in question.

### THE ASSERTED PATENTS

70.    On September 26, 2011, ZoomEssence filed patent application number 13/245,369 with the USPTO, now U.S. Patent No. 8,939,388 (the "'388 Patent"). The USPTO duly and legally issued the '388 Patent, after full and fair examination, on January 27, 2015. The '388 Patent claims priority to provisional application number 61/386,762, filed on September 27, 2010.

71.    On May 10, 2016, the USPTO duly and legally issued the '776 Patent, entitled "Methods and Apparatus For Low Heat Spray Drying." The '776 Patent was issued after full and fair examination of application number 14/606,771, filed by ZoomEssence on January 27, 2015. The '776 Patent is a continuation-in-part of the '388 Patent.

72.    The '776 Patent names Charles P. Beetz, Robert Corbett, and David Salem as inventors. A true and correct copy of the '776 Patent is attached hereto as Exhibit A and incorporated by reference.

73.    On January 24, 2017, the USPTO duly and legally issued the '527 Patent, entitled "Methods and Apparatus For Low Heat Spray Drying." The '527 Patent was issued after

full and fair examination of application number 15/092,561, filed by ZoomEssence on April 6, 2016. The '527 Patent is a continuation of the '776 Patent.

74.     The '527 Patent names Charles P. Beetz, Robert Corbett, and David Salem as inventors as shown in the USPTO's assignment records at Reel/Frame 26984/0626 (for the '388 Patent) and at Reel/Frame 35202/0725 (for the '776 and '527 Patents). A true and correct copy of the '527 Patent is attached hereto as Exhibit B and incorporated by reference.

75.     Dr. Beetz, Mr. Corbett, and Mr. Salem assigned their rights as inventors to the Asserted Patents to ZoomEssence.

76.     ZoomEssence is the owner of all rights, title, and interest in and to the Asserted Patents, and holds the right to take all actions necessary to enforce its rights to the Asserted Patents, including the filing of this patent infringement lawsuit. ZoomEssence also has the right to recover all damages for past, present, and future infringement of the Asserted Patents.

77.     The Asserted Patents are valid and enforceable.

78.     Defendants are not licensed or otherwise authorized to practice the Asserted Patents.

**THE TRADE SECRETS**

79.     ZoomEssence owns valuable, valid and enforceable trade secrets relating to its Zooming Technology. The trade secrets at issue here (the "Trade Secrets") include, among other things, the following confidential and proprietary information shared with Defendants: instructions for and know how regarding optimal concentrations and ratios of feedstock suitable for Zooming Technology; dry powder products (and information about their characteristics) produced via the Zooming process from several known feedstocks with differing constituents; methods, techniques, and other know how regarding employing the Zooming process across particular applications and materials; testing and performance data, including reports and analyses

to evaluate flavor retention and solubility of Zoom-dried products; innovations and know how gleaned from ZoomEssence's continual research and development efforts, including information regarding improvements to Zooming Technology and spray drying generally; equipment design, operating conditions, and process configuration; and proprietary know how about how, across various applications, to commercialize and optimize ZoomEssence's Zooming Technology, including the performance of ingredients and other products used in the Zooming process.

80.    Defendants are not currently licensed or otherwise authorized to use, possess, and/or disclose the Trade Secrets.

### THE ACCUSED PRODUCTS

81.    Upon information and belief, Defendants employ spray drying methods using equipment jointly developed with Fluid Air, Inc. including Fluid Air's "PolarDry®" Model 050, 050+, or both.

82.    Upon information and belief, Fluid Air, Inc. is a subsidiary of Spraying Systems Co. (together with Fluid Air, Inc., "Fluid Air"), a manufacturer of spray nozzles.[29] Among other products, Fluid Air manufactures, sells, and/or operates an electrostatic drying equipment that it has given the trade name "PolarDry®."[30]

83.    Upon information and belief, Defendants offer a "TrueTaste®" product that is made using Fluid Air "PolarDry®" equipment—with "polar" evoking the low-heat nature of the

---

[29] *About Us*, SPRAYING SYSTEMS CO., https://www.spray.com/company/about-us (last visited Dec. 12, 2025).
[30] *See generally* YOUR MOST INNOVATIVE POWDER DEVELOPMENT IDEA, NOW A REALITY!, FLUID AIR | EXPERTS IN SOLID DOSAGE TECHNOLOGY, https://www.cphi-online.com/brochure/polardry-electrostatic-spray-dryer/FA111B.pdf [https://perma.cc/Z49L-JK3F] (last visited Dec. 12, 2025) [hereinafter Fluid Air Brochure]; POLARDRY, FLUID AIR | A DIVISION OF SPRAYING SYSTEMS CO., https://www.fluidairinc.com/en-us/-/media/dam/fluidair/usa/sales-material/product-market-bulletin/fa111-f-polardry.pdf [https://perma.cc/GFU6-6GZD] (last visited Dec. 12, 2025) [hereinafter PolarDry® Brochure].

process (the "TrueTaste® Product"). Such equipment converts liquid-slurry feedstock into powder using a low-temperature liquid-to-powder conversion process (the "TrueTaste® Technology") (collectively, the "Accused Products").

## FACTUAL BACKGROUND

A.    **ZoomEssence Develops Groundbreaking Low-temperature Spray Drying Technology.**

84.    ZoomEssence is a disruptive technology company built on its cutting-edge Zooming Technology.[31]

85.    ZoomEssence initially focused significant resources on applying its technology in the food-and-beverage industry. ZoomEssence employs its Zooming Technology to produce and sell, among other things, "highly concentrated, aromatic, [and] shelf-stable" flavoring and encapsulated ingredients."[32]

86.    Zooming Technology (formerly known as "DriZoom") was pioneered by ZoomEssence's co-founder and longtime Chief Scientist Dr. Charles P. Beetz, a leading physicist and researcher in the industry. Dr. Beetz earned a Ph.D. in Physics from Purdue University, where he won the Lark-Horowitz Prize in Physics. As an undergraduate at Morehead State University, from which he graduated with Distinction, Dr. Beetz was named the Sigma Pi Sigma Outstanding Physics Senior. Dr. Beetz was honored as an outstanding alumnus of the Purdue School of Science and Department of Physics in 2011, and he was elected into the Morehead State University Alumni Hall of Fame in October 2024. Dr. Beetz began his career at General Motors Research Laboratory,

---

[31] *About Us*, ZOOMESSENCE, https://www.zoomessence.com/about-us/ (last visited Dec. 12, 2025).
[32] *ZoomEssence Extends Global Reach With Three New Patents*, BUSINESSWIRE (Feb. 4, 2025, 8:00 AM), https://www.businesswire.com/news/home/20250204052022/en/ZoomEssence-Extends-Global-Reach-With-Three-New-Patents; *ZoomEssence Announces Three New Patents*, PERFUMER & FLAVORIST (Feb. 10, 2025), https://www.perfumerflavorist.com/news/flavor/news/22933021/zoomessence-inc-zoomessence-announces-three-new-patents.

and rose to Principal Scientist before launching several successful startup companies. In 1988, Dr. Beetz co-founded Advanced Technology Materials ("ATM"), a leading provider of semiconductor materials, and participated in ATM's initial public offering on the Nasdaq Exchange in November 1994. In 1996, he co-founded NanoSciences Corporation and developed methods for micro- and nano-machining of silicon wafers. Dr. Beetz is a named inventor of over 50 patents worldwide and has authored 69 publications.

87.    Leveraging his background in physics and technology, Dr. Beetz developed the novel Zooming Technology that optimizes yield efficiency and retention of the starting materials with high precision at ambient or near-ambient temperatures well below 212°F (100° C).

88.    Zooming Technology is the first of its kind, poised to reshape the market for "spray drying," the leading (and over a century-old) process through which pharmaceuticals, chemicals, food ingredients, and other materials are transformed from a liquid to a dry powder at various drying temperatures.

89.    The innovative character of Zooming Technology has been widely recognized and has elicited the support of various government agencies and organizations, including the National Science Foundation, the DOE, the State of Kentucky, and the Public Service Enterprise Group.

90.    The DOE selected and funded ZoomEssence to partner with researchers at the renowned Lawrence Livermore National Laboratory to advance its technology using "commercial and ultramodern" computational fluid dynamics methods (and Livermore's supercomputers), under the DOE's High Performance Computing for Manufacturing ("HPC4Mfg") Program.[33] Moreover, the DOE Advanced Manufacturing Office ("AMO") and

---

[33] Lawrence Livermore Nat'l Lab'y, *supra* note 3.

ZoomEssence successfully completed a two-year project to "build and optimize an infrastructure" for ambient temperature spray drying technology, and "scal[e] the [Zooming] process to an integrated pilot system."[34]

91.    ZoomEssence's breakthrough technology offers several advantages to traditional spray drying, a process of converting a liquid slurry into dry powder that conventionally requires extreme heat upwards of 392° F (200° C). Such a process damages the composition of the initial ingredient, consumes significant quantities of energy and water, and is only suited for matter with elevated boiling points. To solve this industry-wide problem, ZoomEssence developed low-heat spray drying technology at ambient temperatures that significantly improves yield efficiency of the starting materials, makes "drying" certain compounds possible for the first time, and sharply reduces water consumption in the process.

92.    In the flavor applications field, ZoomEssence's encapsulation process captures even the most highly volatile flavor notes—critical "top notes"—thereby delivering "unparalleled aroma and taste" without compromising the integrity of the ingredients, while simultaneously reducing cost.[35] The food-and-beverage industry took note of Dr. Beetz's groundbreaking invention, as it was critical to the future of flavoring and sent shockwaves throughout the industry.[36]

---

[34] U.S. DEP'T. OF ENERGY OFF. OF ENERGY EFFICIENCY & RENEWABLE ENERGY, *supra* note 4, at 2.

[35] *Our Technology*, ZOOMESSENCE, https://www.zoomessence.com/our-technology (last visited Dec. 12, 2025). As the DOE recognizes, "[t]he technology can potentially be applied across the pharmaceuticals, chemicals, and food industries to replace heated spray drying and freeze drying . . . In addition, [Zooming] has the potential to atomize and dry some emulsions previously deemed too viscous for spray drying. . . . Future applications are also possible in polymers and ceramics." U.S. DEP'T. OF ENERGY OFF. OF ENERGY EFFICIENCY & RENEWABLE ENERGY, *supra* note 4, at 1.

[36] *See* Feoshia Anderson, *The Essence of Zoom*, SOAPBOX CINCINNATI (Nov. 30, 2010), https://soapboxmedia.com/1130zoomessence/.

93.     Zooming Technology further pioneered the use of electrostatic atomization in spray drying flavor emulsions. Electrostatic atomization employs a high voltage that causes a liquid to break into minute, charged droplets. Flavor scientists were not motivated to explore this technology's application to spray drying due to the significant safety concerns and equipment costs. ZoomEssence, however, successfully implemented electrostatic atomization in its spray drying process while reducing such risks and costs.

94.     Zooming Technology is covered by several patents, including the '776 Patent and '527 Patent. In total, ZoomEssence owns 28 issued patents, with more open applications pending.[37]

95.     The '527 Patent generally relates to a method of spray drying an ingredient into dry powder using low heat. The method involves a slurry of water, a carrier, and ingredients with a viscosity in a range of from 500 to 16,000 mPa-s that contains from 20 to 50 wt % water. The slurry is atomized into liquid droplets, sprayed into a drying chamber, and converted to dry powder at temperatures less than 212° F (100° C).

96.     The '776 Patent generally relates to a spray dried powder containing a plurality of dried particles that contain a final ingredient encapsulated within a carrier resulting from drying a slurry. The weight percentage of the final ingredient is within about 5% of the initial ingredient—an efficiency of approximately 95%.

**B.     FONA Approaches ZoomEssence and Acquires, Under NDAs, Certain Proprietary Components of Zooming Technology.**

97.     Shortly after ZoomEssence's founding, word spread in the flavor industry about ZoomEssence's disruptive technology. Flavor-industry competitors understood that it

---

[37] *ZoomEssence Intellectual Property*, ZOOMESSENCE, https://www.zoomessence.com/our-technology/intellectual-property/ (last visited Dec. 12, 2025).

produced authentic powdered flavors with significantly improved properties from those possible using traditional spray drying methods.

98.    FONA is one of the flavor-industry competitors who approached ZoomEssence.

99.    In March 2011, FONA's Director of Customer Innovation & Technology emailed ZoomEssence's then-CEO about licensing ZoomEssence's technology. By October, the parties entered into the 2011 NDA, under which ZoomEssence provided FONA with "Proprietary Information and Materials" regarding Zooming Technology. The agreement restricted FONA's use of the Proprietary Information and Materials to a sole purpose: "determining whether [FONA] wishes to enter into" certain business transactions with ZoomEssence. FONA agreed not to use Proprietary Information and Materials "directly or indirectly for any other purpose."

100.    The parties' discussions centered on (i) a contemplated supply arrangement under which FONA would furnish ZoomEssence with liquid flavors that ZoomEssence would convert to powder using Zooming Technology, and (ii) a contemplated licensing arrangement under which FONA would license Zooming Technology from ZoomEssence.

101.    For the next two years, ZoomEssence provided FONA with confidential and proprietary information (under the NDA) in pursuit of a potential partnership.

102.    ZoomEssence and FONA also collaborated, under the NDA, on several projects for large customers, with FONA receiving confidential and proprietary information from ZoomEssence so that FONA was able to supply ingredients in the form necessary for efficient and effective conversion to powder using Zooming Technology.

103.    Despite the companies' productive, years-long collaboration, the parties' relationship came to an abrupt end. In a March 2013 meeting in FONA's offices, the leader of FONA's Beverage Business Unit said that she disapproved of FONA's relationship with

ZoomEssence and ended the parties' collaboration and discussions. FONA stepped away from the relationship with obligations under the NDA, but with no license or other right to use any aspect of Zooming Technology, including the Trade Secrets.

### C.   ZoomEssence Learns That FONA Is Developing Its "Own" Low-Temperature Drying Technology.

104.   Four years after the parties had gone their separate ways, ZoomEssence learned that FONA appeared to be working to develop and commercialize a competing low-temperature drying technology. Concerned that FONA had misused and/or might in the future misuse ZoomEssence's confidential and proprietary information, on July 6, 2017, ZoomEssence wrote FONA to notify it of the '388, '776, and '527 Patents and request confirmation about whether (i) FONA's current and prospective commercial activities infringe ZoomEssence's patent rights, and (ii) the 2011 NDA had been breached.

105.   If FONA had misused ZoomEssence's confidential and proprietary information, it would not have been the first time that a far larger competitor had failed to respect ZoomEssence's rights to its Zooming Technology—ZoomEssence had been forced to sue another competitor, International Flavors and Fragrances, Inc. ("IFF"), for trade secret misappropriation. *See ZoomEssence, Inc. v. Int'l Flavors and Fragrances, Inc.*, No. 12-1471 (TJB) (D.N.J.). ZoomEssence had supplied IFF (under an NDA) similar sorts of confidential and proprietary trade secret information that ZoomEssence supplied to FONA (under the FONA NDA). The parties eventually settled on terms favorable to ZoomEssence—terms that included IFF paying a substantial sum to ZoomEssence. ZoomEssence has used most of the settlement proceeds to fund continued research and development of—and continual improvements to—Zooming Technology.

106.   In response to ZoomEssence's July 2017 letter, FONA insisted that it had not followed IFF's example and categorically denied misusing any information supplied by

ZoomEssence. On August 14, 2017, FONA wrote ZoomEssence and denied breaching the NDA, misappropriating ZoomEssence's Trade Secrets, or infringing ZoomEssence's patents. FONA represented: "FONA does not use, or have any plans to use a low heat spray drying process to spray dry non-conventional slurries" in the ranges claimed in ZoomEssence's patents.

107.    In response to a follow-up letter from ZoomEssence, FONA counsel reiterated that FONA "has no intention of infringing upon ZoomEssence's patent rights."

108.    Without direct evidence to the contrary, ZoomEssence relied on the truth of FONA's and FONA's lawyers' representations.

**D.    FONA Reemerges to Again Propose a Collaboration, Leading to the 2019 NDA and FONA Receiving More Confidential Information.**

109.    Less than a year later, FONA reached out to ZoomEssence expressing renewed enthusiasm for and interest in Zooming Technology and seeking to again explore a potential partnership.

110.    During these discussions, which began in late 2018 and stretched through mid-2020, FONA representatives noted that FONA had a long-standing relationship with Fluid Air, and that it had recently purchased a Fluid Air drying unit in connection with FONA's efforts to develop a commercially viable low-temperature drying business.

111.    Yet FONA made clear to ZoomEssence that FONA's efforts had not been successful. First, over a dinner meeting, FONA represented to ZoomEssence that, as it stood, the value of the low-temperature drying technology that FONA had managed to develop over the preceding six years was worth "less than the cost of our dinner." Second, FONA said that its lawyers had reviewed FONA's low-temperature drying efforts (and commercial hopes) to evaluate FONA's "freedom to operate," and provided legal advice that, FONA intimated, was another

roadblock—*i.e.*, FONA could not operate even its then-worthless technology without violating ZoomEssence's intellectual property rights.

112.    Because FONA continued to express enthusiasm over Zooming Technology and, according to FONA, had concluded that going at it alone was not a viable option, ZoomEssence was optimistic that FONA was serious about a commercial relationship with ZoomEssence this time around. And FONA assured ZoomEssence that it would pay handsomely for what it desperately needed: access to the genuine article, Zooming Technology.

113.    ZoomEssence and FONA executed the 2019 NDA, under which, as in the 2011 NDA, FONA undertakes a Covenant of Confidentiality and a Covenant of Limited Use. The Covenant of Limited Use in the 2019 NDA adds that "neither Party will perform, or cause others to perform, ***any reverse-engineering*** of the other Party's samples or products by chemical analysis or other methods."

114.    Under the 2019 NDA's integration clause, that agreement "supersedes all oral statements and prior writings" on the topic, including the 2011 NDA.

115.    With the 2019 NDA in place, the parties re-engaged, ZoomEssence again provided an array of valuable (now updated) trade secrets, and the parties' ostensibly worked in earnest toward the partnership or purchase that FONA desired.

116.    Under the 2019 NDA, the parties conducted a study that analyzed and compared the performance of ZoomEssence's latest technology and the not-commercialized process that FONA was capable of conducting (a process that employed equipment supplied by Fluid Air). FONA supplied the feedstock used in the study, and ZoomEssence dried the feedstock using Zooming Technology. Among other things, ZoomEssence supplied FONA with the dry-powder product it produced. The results of the study reflected the benefits of Zooming Technology.

117.    Nine months after entering the 2019 NDA, FONA recognized the value in revolutionizing its "portfolio of encapsulation solutions" with Zooming Technology, and, on March 17, 2020 FONA's Chief Operating Officer proposed an "outright acquisition of ZoomEssence by FONA International." That, he believed, was the "best approach" to continuing the parties' relationship—and FONA's access to ZoomEssence's superior technology.

118.    Within a few months, however, FONA performed another abrupt about-face. Without warning, FONA's Chief Operating Officer told ZoomEssence that FONA was "not in a position to continue discussions regarding a potential transaction" and that FONA desired to "conclude the exploration at this time."

119.    Once again, FONA stepped away from the relationship with obligations under an NDA—the now-controlling 2019 NDA—but with no license or other right to use any aspect of Zooming Technology.

### E.    FONA Purports to Develop Its Own Low-Temperature Drying Technology—in a Matter of Months.

120.    In November 2020—five months after breaking off work with ZoomEssence and about a year and a half after confessing that its technology was worthless—FONA made a shocking pronouncement: FONA published a press release announcing the launch of a supposedly brand-new "revolutionary low-temperature spray drying process" that it called "TrueTaste®" Technology.[38] FONA boasted of TrueTaste®'s remarkable capabilities—capabilities that resemble those of Zooming Technology. According to FONA, after eight years of failures, it had, over a 21-month span that happened to coincide with the parties' re-engagement, independently developed technology on par with Zooming.

---

[38] *Introducing TrueTaste, FONA's latest patented flavor technology*, MCCORMICK FONA, (Nov. 9, 2020), https://www.mccormickfona.com/articles/2020/11/introducing-truetaste-fonas-latest-patented-flavor-technology.

121.    FONA was brazen. On December 23, 2020, FONA published a video boasting of "its" unbelievable new technology, and emphasizing that FONA alone had access to the technology.[39] The video remains prominently displayed on McFONA's website.[40] According to the video's two stars, former Vice President of Research & Innovation Dr. Robert Sobel and Vice President of Growth Platforms Becky Wagner:

- "TrueTaste is our latest technology and it's so exciting because we have an industry-changing liquid-to-dry conversion process that nobody else has."

- "TrueTaste is a game changer for the industry."

- "What's exciting about this technology for consumers is that they are going to be able to experience flavors in forms that they've never been able to do before."

- "It's definitely the tool in the arsenal that helps our flavorists be able to create really the flavor fidelity that you haven't been able to capture anywhere else."

- "[TrueTaste] truly is a different technology."

- The revolutionary technology allowed FONA—and only FONA—to dry scores of flavors unsuited for traditional spray drying, including "coffee," "mangoes," "guavas," "horseradish," "wasabi," "berries," "citrus," and "alcohol."

**F.    Emphasizing Its "Industry-Changing" Supposed Innovation, FONA Succeeds in Selling Itself to McCormick for $710 Million.**

122.    Soon after publicly launching TrueTaste®, McCormick bought FONA for $710 million in cash.[41]

---

[39] *TrueTaste* Video, *supra* note 1.
[40] *TrueTaste*, MCCORMICK FONA, https://www.mccormickfona.com/deliver/truetaste (last visited Dec. 12, 2025).
[41] McCormick *closed* the purchase on December 30, 2020. With FONA's Adjusted EBITDA of $30 million, McCormick paid a price-to-earnings multiple of about 23.

123. TrueTaste®,[42] described as FONA's "proprietary [flavor-]encapsulation" technology,[43] was a key driver of the deal—and the $710 million purchase price. It is unclear what, if any, diligence McCormick performed on "TrueTaste®" and its provenance before buying FONA and touting FONA's technology. It did, however, make clear that TrueTaste® was integral to its $710 million purchase:

> "The acquisition of FONA . . . extends our technology platform[,] strengthens our capabilities," and "accelerates the strategic migration of our portfolio to more value-added and technically insulated products and thus, is expected to be accretive to gross margin."[44]

124. FONA's sudden and frenzied re-engagement from 2018–2020 began to add up. FONA was quietly on the auction block, and FONA was desperate to position itself as a cutting-edge technology company—*i.e.*, a company deserving of a high-tech valuation multiple.

### G. ZoomEssence Learns, in 2025, That Defendants Stole ZoomEssence's Technology and Willfully Infringes ZoomEssence's Patents.

125. ZoomEssence had long suspected that FONA must have misused ZoomEssence's innovations to develop TrueTaste®. In April 2019, FONA's technology was deemed worthless and ineffective. Yet after ZoomEssence supplied FONA, under the 2019 NDA, with invaluable, then-state-of-the-art proprietary information FONA, in quick succession, broke away from ZoomEssence, publicly launched TrueTaste®, and published a heavily produced video featuring TrueTaste® in action. It didn't add up.

---

[42] The "TRUETASTE" mark was registered with the U.S. Patent and Trademark Office ("USPTO") by FONA International, Inc. on March 13, 2018. *See* U.S. Reg. No. 5,424,705. A Section 8 and Section 15 Declaration of Use and Incontestability was signed by Kathryn Dachille, Associate Counsel – Intellectual Property for McCormick, on March 19, 2024.
[43] *McCormick Acquires FONA International, LLC*, McCormick & Co. (Dec. 30, 2020), https://mccormickcorporation.gcs-web.com/news-releases/news-release-details/mccormick-acquires-fona-international-llc.
[44] *Id.*

126.    Finally, ZoomEssence's suspicions were confirmed earlier this year: Defendants stole "industry-changing" technology from ZoomEssence.[45] Two recent revelations leave no doubt that Defendants (a) misappropriated ZoomEssence's Trade Secrets and flouted its obligations under the 2019 NDA, and (b) are willfully infringing ZoomEssence's patents, including both patents in suit.

127.    First, ZoomEssence learned in March 2025 from a former FONA consultant—an individual who worked for a reverse-engineering firm—that FONA had hired the firm to try to unlock the secrets of Zooming Technology. FONA had, according to the consultant, supplied the firm with ZoomEssence Trade Secrets and charged it with analyzing ZoomEssence flavored dry-powder products and replicating ZoomEssence's methods and output—*i.e.*, reverse engineering—so that FONA could determine how to formulate a product to "beat" ZoomEssence's performance.

128.    FONA thus flouted ZoomEssence's intellectual property rights and the clear and obvious terms of the 2019 NDA, which prohibit FONA from performing "or caus[ing] others to perform, any reverse-engineering of the other Party's samples or products by chemical analysis or other methods."

129.    Second, and also in 2025, Fluid Air (FONA's onetime office park neighbor) published technical literature and marketing materials revealing, without a shadow of a doubt, that the products and processes marketed by McFONA as TrueTaste® Technology infringe ZoomEssence's patents, including the Asserted Parents:

---

[45] Whether knowingly, through inadequate diligence, or otherwise, McCormick acquired all of FONA, including all liabilities stemming from FONA's theft of ZoomEssence's intellectual property.



130. Indeed, the infringing Fluid Air PolarDry® equipment that is the subject of those materials is even featured by FONA in its promotional video (the "TrueTaste Video"):[46]



131. It appears that FONA's attempts to engage with ZoomEssence were a ruse to acquire confidential and proprietary information about Zooming Technology—all in the hopes that FONA could commercialize TrueTaste® and use it to inflate its sale price and reap unjust profits.

132. Upon information and belief, improving the performance of the TrueTaste® Technology was an important part of making FONA an attractive acquisition candidate, which

---

[46] *TrueTaste* Video, *supra* note 1, at 0:31.

motivated FONA to cut corners by acquiring ZoomEssence's confidential information via improper means. Indeed, FONA needed to commercialize TrueTaste® and try to bridge the gap between TrueTaste® and Zooming Technology in order to sell itself not just as a flavor house, but an innovator with cutting-edge technology. When FONA managed to get enough proprietary information from ZoomEssence, it cast ZoomEssence aside.

133.    While FONA previously denied misappropriating ZoomEssence's technology, based on the new information ZoomEssence learned this year, it is now apparent that FONA's representations were false. FONA worked secretly and intentionally to improperly acquire ZoomEssence's proprietary and confidential information, in violation of the parties' NDAs and contrary to governing law protecting ZoomEssence's intellectual property rights.

134.    The fallout is multifaceted and wide spread. Defendants have falsely marketed and implemented stolen game-changing technology across its Flavor Solutions Division, profiting immensely. In the years since McCormick's acquisition of FONA, McFONA's Flavor Solutions Division has reported Adjusted Operating Income of about $5 billion.

135.    Defendants' misappropriation has allowed it to unfairly compete with ZoomEssence. McCormick is one of the largest flavor companies in the world and already controls a vast market share in the industry. And it is misusing ZoomEssence's proprietary technology—so far, with impunity—to unjustly enrich itself, while damaging ZoomEssence through, among other things, lost profits, lost licensing revenue, lost market share, and lost business opportunities as the inventor of revolutionary technology.

**H.    ZoomEssence Has the Pioneering Patents in the Field, and Defendants Have Long Known About Them.**

136.    While FONA has obtained its own patents in this field, they all come after FONA's access to ZoomEssence Trade Secrets under the 2011 and/or 2019 NDAs. And they largely cite ZoomEssence's earlier, pioneering patents.

137.    On January 28, 2015, the day after ZoomEssence's '388 Patent issued, FONA Technologies, Inc. filed its first provisional patent application covering process conditions for low-temperature electrostatic spray drying equipment. This application (No. 62/108904) is directed to "Flavor Encapsulation Using Electrostatic Atomization." On January 27, 2016, FONA Technologies, Inc. filed a PCT patent application (PCT/US2016/015136) claiming priority to its provisional application. On August 4, 2016, FONA's PCT patent application published as International Publication No. WO2016123224A1. The International Search Report published with FONA's PCT publication identifies ZoomEssence's '388 Patent as a document of particular relevance.

138.    On November 3, 2016, Defendants' longtime collaborator, Fluid Air, filed a U.S. patent application titled "Apparatus And Method For Spray Drying," which was issued on May 14, 2019 as U.S. Patent No. 10,286,411 (the "'411 Patent"). Upon information and belief, the '411 Patent relates to the Fluid Air PolarDry® equipment. The '411 Patent identifies ZoomEssence's '388 Patent in the References Cited section on the face of the '411 Patent. While the '411 Patent is held by Fluid Air, *FONA*'s former Vice President of Research & Innovation, Dr. Robert Sobel, is a named inventor. Fluid Air disclosed the '388 Patent to the USPTO in an Information Disclosure Statement ("IDS") filed on July 18, 2017, and the Examiner cited the '388 Patent as prior art in support of an obviousness rejection in an Office Action dated November 1, 2018.

139.    On July 18, 2017, FONA Technologies, Inc. filed U.S. Patent Application 15/652,486. The application, titled "Flavor Encapsulation Using Electrostatic Atomization," was issued on February 1, 2022 as U.S. Patent No. 11,235,303 (the "'303 Patent"). The '303 Patent identifies the Asserted Patents and the '388 Patent in the References Cited section on the face of the '303 Patent. FONA disclosed Asserted Patents and the '388 Patent to the USPTO in an IDS filed on July 18, 2017, and the Examiner cited the '388 Patent as anticipatory prior art in an Office Action dated June 26, 2016.

140.    On December 15, 2021, FONA Technologies, LLC filed U.S. Patent Application 17/552,011. The application, titled "Flavor Encapsulation Using Electrostatic Atomization," was issued on December 19, 2023 as U.S. Patent No. 11,845,052 (the "'052 Patent"). The '052 Patent identifies the Asserted Patents and the '388 Patent on the face of the '052 Patent. FONA disclosed Asserted Patents and the '388 Patent to the USPTO in an IDS filed on December 30, 2021.

141.    The Asserted Patents have been in force for nine and eight years, respectively, and Defendants have known about them since at least 2017. ZoomEssence thus has the settled expectation that the Asserted Patents are valid and enforceable.

**COUNT I**
**Infringement of U.S. Patent No. 9,551,527**
**(Against Defendant McCormick)**

142.    All foregoing allegations are incorporated by reference as if fully set forth here.

143.    Defendant McCormick has directly infringed and continues to directly infringe the '527 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, and/or selling in the United States, or importing into the United States, products that satisfy each and every limitation of one

or more claims of the '527 Patent, including at least the Accused Products. The Accused Products are identified based on publicly available information, and ZoomEssence reserves the right to identify additional infringing activities, evidence, and products on the basis of information obtained for example, during discovery.

144.    For example, the Accused Products infringe at least claim 1 of the '527 Patent. Claim 1 of the '527 Patent recites:

1.  A method of spray drying an ingredient into a dried powder, comprising:

    forming a slurry including water, a carrier, and the ingredient, wherein the slurry has a viscosity in a range of from 500 to 16,000 mPa-s, and contains from 20 to 50 wt. % water, wherein the carrier comprises at least one selected from the group consisting of starch and modified starch, and wherein the ingredient comprises at least one selected from the group consisting of foods, flavors, fragrances, medicaments, bacteria, probiotics, and pigments;

    atomizing the slurry to generate a spray of liquid droplets of the slurry;

    introducing the spray of liquid droplets of the slurry into a drying chamber; and

    feeding air at temperature less than 100° C. into the drying chamber to dry the liquid droplets to form the dried powder comprising a plurality of dried particles containing the ingredient encapsulated within the carrier.

145.    The Accused Products practice each limitation of Claim 1 of the '527 Patent.

146.    Upon information and belief, McCormick owns and/or operates Fluid Air PolarDry® equipment, an electrostatic spray drying technology that uses a low evaporation temperature to convert an ingredient to a dried powder.[47]

---

[47] Fluid Air Brochure, *supra* note 30, at 5.

147.    Upon information and belief, the TrueTaste® Product is a dry powder made using the PolarDry® equipment. The promotional TrueTaste® video captures footage of the Fluid Air PolarDry® equipment.[48] Upon information and belief, the PolarDry® equipment seen in the TrueTaste® video is owned and/or operated by McCormick:



---

[48] *TrueTaste* Video, *supra* note 1, at 0:31.

148.    Upon information and belief, McCormick owns and/or operates PolarDry®

Model 050, Model 050+, or both:[49]



149.    The PolarDry® system "consist[s] of a spray chamber with an

accompanying lid, a separation plenum, feed delivery, a drying gas recirculation system, and a

discharge cone for collection of the finished product. There are also secondary fixtures such as

valves and associated process controls."[50]

---

[49] PolarDry® Brochure, *supra* note 30, at 12.
[50] PolarDry® Brochure, *supra* note 30, at 7; Fluid Air Brochure, *supra* note 30, at 7.

150.    Spray drying with the PolarDry® system is achieved by "forcing the liquids outward, and the liquid layer protects the active components from the physical stress of the temperatures in the drying chamber. As the particles flow through the chamber, the vaporized liquids cool the chamber, resulting in lower outlet and product temperatures and further protecting the dry active components."[51]

151.    PolarDry® is intended to be used with a slurry made up of three components: water (or other solvent), a carrier, and an active ingredient:[52]



152.    The slurry has a range of composition and properties within the claimed ranges of the '527 Patent. For example, the PolarDry® Brochure provides production rates for different PolarDry® models and the key showing the percentages of solids in the slurry when the dryer's exhaust saturation is at 60%.[53] The key includes a slurry with 60% solids and 40% water,

---

[51] PolarDry® Brochure, *supra* note 30, at 5; Fluid Air Brochure, *supra* note 30, at 5.
[52] Fluid Air Brochure, *supra* note 30, at 5; PolarDry® Brochure, *supra* note 30, at 5.
[53] *Id.* at 14.

and a slurry of 50% solids and 50% water. Both compositions are within the claimed range of 20% to 50% water:



153.    A person of skill in the art would recognize that a slurry comprising water, a carrier, and an ingredient of a type disclosed in the PolarDry® Brochure with 40%–50% water inherently has viscosities in the claimed range of 500 to 16,000 mPa-s.

154.    The PolarDry® slurry uses "starch" as the carrier:[54]

> Typically, the encapsulation in a traditional spray dryer uses an emulsion made up of three components; a solvent (water or solvent), a carrier (starch), and a core/active (oil or vitamin). The object of Spray

155.    The PolarDry® slurry is atomized, generating a spray of liquid droplets: "liquid droplets of the starting material containing the active ingredient and possible carriers are atomized and sprayed into a drying gas stream."[55] The spray of liquid droplets is fed into a drying chamber:[56]

---

[54]    Fluid Air Brochure, *supra* note 30, at 5; *Spray Drying Overview*, FLUID AIR, https://www.fluidairinc.com/en-us/processes/spray-drying (last visited Dec. 12, 2025).
[55] PolarDry® Brochure, *supra* note 30, at 4; *see also* Fluid Air Brochure, *supra* note 30, at 7.
[56] PolarDry® Brochure, *supra* note 30, at 7; Fluid Air Brochure, *supra* note 30, at 7.

MODEL 004 – MODEL 050+



156.    "During the drying process, electrostatic charge on the droplet's surface increases the rate of diffusion of liquids to the outside of the droplet, allowing all liquids to evaporate more quickly and forcing any solids in the droplet inward."[57] As a result, drying can be achieved at lower temperatures than conventional spray drying and "protects heat sensitive active components."[58]



---

[57] PolarDry® Brochure, *supra* note 30, at 4.
[58] *Id.*; Fluid Air Brochure, *supra* note 30, at 5.

157.    The liquid droplets are dried within the drying chamber at a temperature range of 35° C–100° C (95° F–212° F). Such temperature range is within the claimed range of less than 100° C (212° F).



158.    "When the liquids evaporate, a solid particle is created that flows cyclonically to the bottom of the dryer. The product is a powder with the desired powder properties that does not require any further downstream processing to reduce particle size."[59]

---

[59] PolarDry® Brochure, *supra* note 30, at 4.

159.    The PolarDry® technology may be applied to components of the categories of food, cosmetics, biopharma, probiotics, and colors, among others. The PolarDry® and Fluid Air Brochures list the various applications for its technology, as seen below:[60]



160.    Upon information and belief, McCormick knew that ZoomEssence had patents covering low-temperature spray drying technology and a dry powder product based on McCormick's conduct of monitoring its competitors, including patents of competitors such as ZoomEssence, and investigating and assessing potential infringement of those patents.

161.    Indeed, knowledge of and intention to infringe the '527 Patent is evidenced by the striking similarity between the '527 Patent and the Accused Products.

162.    Alternatively, McCormick has had knowledge of the '527 Patent and of McCormick's infringement thereof because of their active monitoring of Plaintiff's patent portfolio, including since at least July 6, 2017, when ZoomEssence notified FONA of the '388, '776, and '527 Patents and requested confirmation whether the 2011 NDA had been breached.

---

[60] *Id.* at 17; Fluid Air Brochure, *supra* note 30, at 16.

163.    Alternatively, McCormick has had knowledge of the '527 Patent and of McCormick's infringement thereof since at least July 18, 2017, the filing date of FONA Technologies' '303 Patent which cites to the '527 Patent.

164.    McCormick indirectly infringed and continues to indirectly infringe one or more of the claims of the '527 Patent, as provided by 35 U.S.C. § 271(b), by actively inducing infringement by third parties, such as McCormick's customers and/or end-users, including Fluid Air, in this District and elsewhere in the United States.

165.    McCormick's customers and/or end-users directly infringe, either literally or under the doctrine of equivalents, at least by using the inventions claimed in the '527 Patent. McCormick knowingly induces this direct infringement through its intentional, affirmative acts of making, selling, distributing, and/or otherwise making available the Accused Products, intending to encourage, and in fact encouraging, customers and end-users to directly infringe the '527 Patent. McCormick actively induces infringement by, among other things, marketing and publishing promotional literature describing the Accused Products, and by advertising and providing instructions, product manuals, case studies, documentation, and/or other information to customers and/or end-users suggesting that they use the Accused Products in an infringing manner, including offering technical support to their customers and/or potential customers of the Accused Products.

166.    For example, McCormick actively induces infringement by Fluid Air by assisting, encouraging, and/or instructing Fluid Air regarding the use and development of the Accused Products. Fluid Air equipment includes PolarDry® Models 050 and/or 050+, infringe the Asserted Patents. Upon information and belief, McCormick has knowingly provided and/or is providing instructions, product manuals, case studies, documentation, technical support, and/or other information to Fluid Air in order to produce the PolarDry® equipment.

167. Additionally, McCormick actively encouraged and continues to actively encourage third parties to directly infringe the '527 Patent by advertising and/or providing instructions to use the Accused Products in an infringing manner. For example, McCormick advertises and hosts "Flavor University®" courses for food industry professionals.[61]

168. Flavor University features "Savory Flavor 201®," which covers topics such as "Savory Flavor Generation" where participants "[d]iscuss the mechanics and commercialization of savory flavors, including reaction and processed flavors, compounded topnotes, finished flavor forms, drying techniques and seasoning vs. flavors:"[62]



169. McCormick actively induces infringement by advertising and/or instructing third parties on how to use the Accused Products during at least the Savory Flavor 201 course.

---

[61] *Flavor University*®, MCCORMICK FONA, https://www.mccormickfona.com/learn/flavor-university (last visited Dec. 12, 2025).

[62] *Savory Flavor 201*®, MCCORMICK FONA, https://www.mccormickfona.com/learn/flavor-university/savory-flavor-201 (last visited Dec. 12, 2025).

170.    Additionally, McCormick's website prominently advertises TrueTaste® Technology's infringing features, promoting "[l]ess abusive processing conditions and better encapsulation lead[ing] to retention of volatiles, PLUS less oxidation and a longer shelf life." McCormick also touts that "[t]he special approach allows you to capture the taste of a liquid (like juice or beer) in a dry flavor with better dispersion and a fantastic shelf-life."[63]

171.    Moreover, below these descriptions, McCormick prominently encourages potential customers and/or third parties to "Request a Sample" of its TrueTaste® Products, "Contact An Account Exec," and "Browse Our Markets"[64]:



  

---

[63] *TrueTaste*®, McCormick FONA, https://www.mccormickfona.com/deliver/truetaste (last visited Dec. 12, 2025).
[64] *Id.*

172.    McCormick actively encouraged and continues to actively encourage third parties to infringe the '527 Patent by, for example, directing and/or controlling the manufacturing operations of third parties. McCormick provides instruction, guidelines, quality control requirements, and/or on-site technical support to assist third parties to perform the infringing TrueTaste® Technology and/or produce the TrueTaste® Product.

173.    For example, upon information and belief, McCormick instructs Fluid Air to infringe on the methods claimed in the '527 Patent to manufacture and/or develop the Accused Products. Upon information and belief, McCormick instructed Fluid Air to develop a competing low-temperature liquid-to-powder drying technology and the PolarDry® equipment. Upon information and belief, McCormick directed and/or controlled, and continues to direct and/or control, the performance and/or manufacture of the Accused Products. Spraying Systems in turn offers certain services to downstream PolarDry® customers, including instructions, case studies, product manuals, and technical support for the Accused Products:[65]



---

[65] *Polardry Electrostatic Drying Technology*, FLUID AIR, https://www.fluidairinc.com/en-us/products/electrostatic-spray-dryers (last visited Dec. 12, 2025).

174.    As a result of McCormick knowingly providing instructions and/or exerting control over the PolarDry® and/or TrueTaste® manufacturing and/or development process, Fluid Air is induced to infringe the '527 Patent.

175.    Because of McCormick's inducement, third parties use the Accused Products in a way McCormick intends and they directly infringe the '527 Patent. McCormick performs these affirmative acts with pre-suit knowledge of the '527 Patent and with the intent, or willful blindness, that the induced acts directly infringe the '527 Patent.

176.    McCormick has engaged in deliberate and willful behavior with knowledge of the '527 Patent at least through ZoomEssence's notice to FONA of the Asserted Patents on July 6, 2017, as well as McCormick's active monitoring of Plaintiff's patent portfolio and FONA Technologies' citation of the '527 Patent as prior art during prosecution of its '303 Patent and '052 Patent, filed on July 18, 2017 and December 15, 2021, respectively. McCormick knew or should have known that their actions constituted direct and/or indirect infringement of the '527 Patent. As a result, McCormick's infringement of the '527 Patent is willful under 35 U.S.C. §§ 284 and 285.

177.    The marking requirements of 35 U.S.C. § 287 do not apply to the '527 Patent.

178.    ZoomEssence has suffered and continues to suffer damages as a direct and proximate result of McCormick's direct and indirect infringement of the '527 Patent in an amount to be proven at trial.

## COUNT II
### Infringement of U.S. Patent No. 9,332,776
### (Against Defendant McCormick)

179.    All foregoing allegations are incorporated by reference as if fully set forth here.

180.    Defendant McCormick, as the successor-in-interest to FONA and doing business as McCormick-FONA, has directly infringed and continues to directly infringe the '776 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, and/or selling in the United States, or importing into the United States products that satisfy each and every limitation of one or more claims of the '776 Patent, including at least the Accused Products. The Accused Products are identified based on publicly available information, and ZoomEssence reserves the right to identify additional infringing activities, evidence, or products on the basis of information obtained, for example, during discovery.

181.    For example, the Accused Products infringe at least claim 1 of the '776 Patent. Claim 1 of the '776 Patent recites:

1.    A spray dried powder, comprising:

a plurality of dried particles, which individually contain an amount of final active ingredient encapsulated within a carrier resulting from drying a slurry containing an initial active ingredient, a liquid solvent and the carrier, wherein:

the initial active ingredient includes one or more constituent components, at least one of which is among one or more principle molecular types from which at least one of a desirable food, flavor, fragrance, medicament, and pigment is obtained;

the final active ingredient includes one or more of the constituent components corresponding with those of the initial active ingredient as modified by the drying of the slurry; and

a weight percentage of at least one of the one or more principle molecular types in the final active ingredient is within about 5% of a weight percentage of the corresponding principle molecular types in the initial active ingredient.

182.    The Accused Products practice each limitation of Claim 1 of the '776 Patent.

183.    Upon information and belief, McCormick owns and/or operates Fluid Air PolarDry® equipment used to make the TrueTaste® Product.

184.    The TrueTaste® Product is a dry powder made using Fluid Air PolarDry® equipment.[66]

185.    PolarDry® is intended to be used with a slurry comprising three components: water (or other solvent), a carrier, and an initial ingredient.[67]

186.    The TrueTaste® Product is dried using a liquid-to-dry conversion technology, where "liquid droplets of the starting material containing the [initial] active ingredient and possible carriers are atomized and sprayed into a drying gas stream."[68] The dried particles individually contain an amount of the final ingredient encapsulated within a carrier, such that the final "product is a powder with the desired powder properties."[69]

187.    The initial ingredient of the TrueTaste® Product is derived from one or more constituent components of products including, but not limited to, food, cosmetics, biopharma, probiotics, and colors.[70] The final ingredient resulting from the drying of the slurry contains one or more of the constituent components of the initial ingredient.

188.    At least one of the one or more principle molecular types in the final ingredient in certain TrueTaste® Products falls within the claimed weight percentage of the corresponding principle molecular types in the initial ingredient.

189.    At least one of the one or more principle molecular types in the final ingredient in certain TrueTaste® Products falls within the claimed weight percentage of the

---

[66] See, e.g., TrueTaste Video, supra note 1, at 0:31.
[67] Fluid Air Brochure, supra note 30, at 5; PolarDry® Brochure, supra note 30, at 5.
[68] PolarDry® Brochure, supra note 30, at 4.
[69] Id.
[70] See id. at 17; Fluid Air Brochure, supra note 30, at 16.

corresponding principle molecular types in the initial ingredient, as shown by data provided by FONA regarding the performance of TrueTaste® Technology.

190.    McCormick knew that ZoomEssence had patents covering low-temperature spray-drying technology and a dry-powder product based on McCormick's conduct of monitoring its competitors, including patents of competitors such as ZoomEssence, and investigating and assessing potential infringement of those patents.

191.    Knowledge of and intention to infringe the '776 Patent is evidenced by the striking similarity between the '776 Patent and the Accused Products.

192.    Alternatively, McCormick has had knowledge of the '776 Patent and of McCormick's infringement thereof because of their active monitoring of Plaintiff's patent portfolio, including since at least July 6, 2017, when ZoomEssence contacted FONA notifying FONA of the '388, '776, and '527 Patents and requested confirmation whether the 2011 NDA had been breached.

193.    Alternatively, McCormick has had knowledge of the '776 Patent and of Defendants' infringement thereof since at least July 18, 2017, the filing date of FONA Technologies' '303 Patent which cites to the '776 Patent.

194.    McCormick indirectly infringed and continues to indirectly infringe one or more of the claims of the '776 Patent, as provided by 35 U.S.C. § 271(b), by actively inducing infringement by third parties, such as McCormick's customers and/or end-users, in this District and elsewhere in the United States.

195.    McCormick's customers and/or end-users directly infringe, either literally or under the doctrine of equivalents, at least by using the inventions claimed in the '776 Patent. McCormick knowingly induces this direct infringement through its intentional, affirmative acts of making, selling, distributing, and/or otherwise making available the Accused Products, intending

to encourage, and in fact encouraging, customers and end-users to directly infringe the '776 Patent. McCormick actively induces infringement by, among other things, marketing and publishing promotional literature describing the Accused Products, and by advertising and providing instructions, product manuals, case studies, documentation, and/or other information to customers and/or end-users suggesting that they use the Accused Products in an infringing manner, including offering technical support to customers and potential customers of the TrueTaste® Product. McCormick also actively induces infringement by Fluid Air by assisting, encouraging, and/or instructing Fluid Air regarding the development of the Accused Products.

196.    McCormick actively encouraged and continues to actively encourage third parties to directly infringe on the '776 Patent by advertising and providing instructions to use the Accused Products in an infringing manner. Flavor University® features "Flavor 101®," an "interactive course" covering topics including the "Anatomy of a Flavor" and "Flavor As An Ingredient:"[71]

---

[71]    *Flavor 101®*, MCCORMICK FONA, https://www.mccormickfona.com/learn/flavor-university/flavor-101 (last visited Dec. 12, 2025).

**Flavor 101®**

You have food knowledge. Let's add some flavor. Here's a look at exactly what you'll learn in our interactive Flavor 101 course.

**Class Topics**

**Defining Flavor**

What is flavor? Learn how flavor is influenced by our senses, how the FDA classifies flavors and why flavors are used.

**The Role of Sensory**

Explore the science of sensory and its role in the world of product development. Learn about the three main types of sensory testing (affective/consumer, discrimination/difference, descriptive) and how each can benefit the product development process.

**Trends**

Dive in to what's hot and what's next with FONA's innovative Flavor Radar®, a flavor mapping methodology. You'll track flavors on their journey from novel to everyday pantry staple and learn how they transition from one category to the next.

**Instrumental Analysis**

Formulation, sensory and instrumental analysis are the three main facets of flavor creation. Learn about the key role of analysis through an investigation of techniques and a case study to examine analytical process and results.

**Anatomy of a Flavor**

A flavor is divided into three main parts: flavor components, carriers/solvents and other non-flavor ingredients. Learn what constitutes each and how they work together to create a finished flavor. You'll also take a peek into a flavor chemist's toolbox and learn about the different layers of a flavor that provide aroma, character and fullness.

**Labeling**

Take a look at the laws governing labeling and specific situations including food allergens, flavoring agents, ingredient classifications, flavor categories, organic, kosher and halal.

**Process Flavor Development**

Process flavors are also knows as savory flavors. In this section you'll learn what constitutes a savory flavor and how they are generated, then you'll examine labeling requirements.

**Flavor As an Ingredient**

Walk through the finished product considerations product developers must address when adding flavor to the end application: base impact, form & solvent selection, flavor balance, how to evaluate, flavor interactions and production levels.

**Flavor Descriptors**

Flavorists, applications scientists, product developers and marketing experts all need to have a common understanding of the desired flavor profile and the flavors they taste during its development. This can be tricky because everyone has their own ideas and perceptions about flavor. Learn how flavor descriptors help people speak a common language and clearly communicate about flavors in this hands-on segment.

REGISTER FOR A COURSE NOW

197.    Additionally, McCormick's website prominently advertises TrueTaste® Technology's infringing features, promoting "[l]ess abusive processing conditions and better encapsulation lead[ing] to retention of volatiles, PLUS less oxidation and a longer shelf life." McCormick also touts "[t]he special approach allows you to capture the taste of a liquid (like juice or beer) in a dry flavor with better dispersion and a fantastic shelf-life."[72]

---

[72] *TrueTaste®*, MCCORMICK FONA, https://www.mccormickfona.com/deliver/truetaste (last visited Dec. 12, 2025).

198.    Below these descriptions, McCormick prominently encourages potential customers and/or third parties to "Request a Sample" of its TrueTaste® Products, "Contact An Account Exec," and "Browse Our Markets":[73]





199.    McCormick actively encourages and continues to actively encourage third parties to infringe the '776 Patent by, for example, directing and controlling the manufacturing operations of customers and/or third parties. McCormick knowingly provides instruction, guidelines, quality control requirements, and/or on-site technical support to third parties who acquire and/or use the Accused Products.

200.    For example, upon information and belief, McCormick instructs Fluid Air to manufacture and/or develop the Accused Products as part of McCormick's R&D and/or commercial production activities.

---

[73] *Id.*

201.    Upon information and belief, McCormick instructs Fluid Air to manufacture and/or develop the Accused Products with the intent that McCormick's customers and end users acquire and/or use the TrueTaste® Product. As a result of McCormick knowingly providing instructions and/or exerting control over the Accused Products' manufacturing and/or development process, Fluid Air and McCormick's customers and end-users are induced to infringe the '776 Patent.

202.    Because of McCormick's inducement, third parties use the Accused Products in a way McCormick intends and they directly infringe the '776 Patent. McCormick performs these affirmative acts with pre-suit knowledge of the '776 Patent and with the intent, or willful blindness, that the induced acts directly infringe the '776 Patent.

203.    McCormick has engaged in deliberate and willful behavior with knowledge of the '776 Patent at least through ZoomEssence's notice to FONA of the Asserted Patents on July 6, 2017, as well as McCormick's active monitoring of Plaintiff's patent portfolio and FONA Technologies' citation of the '776 Patent as prior art during prosecution of its '303 Patent and '052 Patent, filed on July 18, 2017 and December 15, 2021, respectively. McCormick knew or should have known that their actions constituted direct and/or indirect infringement of the '776 Patent. As a result, McCormick's infringement of the '776 Patent is willful under 35 U.S.C. §§ 284 and 285.

204.    ZoomEssence provided notice of infringement of the '776 Patent on July 6, 2017 via letter communication that identified the '776 Patent and included current and prospective commercial activities that may conflict with ZoomEssence's U.S. Patents, thus satisfying 35 U.S.C. § 287. ZoomEssence again discussed its patents after the signing of the 2019 NDA, at which point ZoomEssence learned FONA had obtained an opinion of counsel. Despite the

foregoing, FONA nonetheless launched its infringing TrueTaste® Technology and Products on November 9, 2020.

205.    ZoomEssence has suffered and continues to suffer damages as a direct and proximate result of McCormick's direct and indirect infringement of the '776 Patent in an amount to be proven at trial.

## COUNT III
### Violation of the DTSA, 18 U.S.C. § 1836, *et seq.*
### (Against All Defendants)

206.    All foregoing allegations are incorporated by reference as if fully set forth here.

207.    Defendants have misappropriated ZoomEssence's Trade Secrets in violation of the DTSA, 18 U.S.C. § 1836 *et seq.*

208.    ZoomEssence owns valuable, valid, and enforceable Trade Secrets relating to its Zooming Technology.

209.    ZoomEssence's Trade Secrets are confidential, proprietary, and not generally known or readily ascertainable through proper means. ZoomEssence has taken reasonable measures to protect its Trade Secrets and other confidential information relating to its Zooming Technology, including by not disclosing it to the public and maintaining security measures to prevent improper access to its Trade Secrets and other confidential information.

210.    For example, ZoomEssence's employees are bound by confidentiality and assignment of invention agreements. ZoomEssence's employee handbook further outlines its policies regarding protection of its Trade Secrets and confidential information. Additionally, ZoomEssence maintains password-protected networks and restricts internal access to its Trade Secrets to only the departments and/or employees tasked with projects that use such Trade Secrets.

ZoomEssence also limits external access of its Trade Secrets by requiring the regular execution of NDAs by third parties, such as the 2019 NDA.

211.    ZoomEssence has invested significant time, money, and resources to develop its Trade Secrets to provide its flavor solutions services and products using its Zooming Technology to customers in the State of Texas and nationwide. ZoomEssence has invested tens of millions of dollars to develop its Trade Secrets related to Zooming Technology, including, but not limited to, optimizing the liquid-to-dry conversion and encapsulation processes, the methods in which the formulas are prepared, optimal ingredients and concentrations, equipment design, testing and performance, and other confidential and proprietary information and know how. As a result of its efforts, ZoomEssence pioneered the low-temperature spray drying process that is of great value to ZoomEssence and its competitors, and has secured a competitive advantage in the industry.

212.    ZoomEssence's Trade Secrets have actual and/or potential independent economic value from not being generally known to and not being readily ascertainable through proper means by ZoomEssence's competitors and third parties, who can obtain economic value from the disclosure or use of the information.

213.    ZoomEssence's Trade Secrets relate to products and/or services used in, or intended for use in, interstate and foreign commerce. ZoomEssence conducts business with in-state and out-of-state customers, including customers in several states and countries who seek ZoomEssence's flavor solutions services and products developed by and related to Zooming Technology.

214.    During the relationship between ZoomEssence and Defendants, Defendants had access to ZoomEssence's Trade Secrets and confidential and proprietary information relating to Zooming Technology.

215.    Defendants agreed to maintain ZoomEssence's Trade Secrets confidential and limit use of such information. For example, under the 2019 NDA, Defendants agreed to not disclose or use ZoomEssence's "Proprietary Information and Materials" in any way that is outside the scope of the NDA. FONA also agreed to return and discontinue use of all "Proprietary Information and Materials" upon the written request by ZoomEssence. As such, Defendants had a duty to maintain the secrecy or limit the use of such information.

216.    Defendants used improper means to acquire ZoomEssence's Trade Secrets, in breach of their confidentiality and no-reverse-engineering obligations. Upon information and belief, Defendants unlawfully retained ZoomEssence's Trade Secrets during and/or after the relationship with ZoomEssence concluded, first in 2013, and again in 2020.

217.    Upon information and belief, FONA disclosed confidential and proprietary information and Trade Secrets of ZoomEssence to Fluid Air to teach Fluid Air how to build electrostatic spray drying equipment and/or to manufacture the Accused Products, that could compete with Zooming Technology.

218.    Upon information and belief, FONA disclosed confidential and proprietary information and Trade Secrets of ZoomEssence to McCormick during negotiations and/or after McCormick's acquisition of FONA to frame FONA as an attractive acquisition candidate with invaluable spray dry capabilities.

219.    Upon information and belief, Defendants reverse-engineered aspects of ZoomEssence's Zooming Technology. Defendants acted without express or implied consent by ZoomEssence and in violation of applicable non-disclosure obligations.

220.    Upon information and belief, Defendants have used and/or are using ZoomEssence's Trade Secrets and other confidential information as the foundation for and to develop its TrueTaste® Technology and Products, to expand its low-temperature spray dry

business in competition with ZoomEssence, and to acquire customers in Texas and nationwide. For example, FONA retained a reverse-engineering firm to analyze a ZoomEssence dry flavor product so FONA could determine how to formulate a product to "beat" ZoomEssence's performance.

221.    Moreover, upon information and belief, Defendants unlawfully incorporate Zooming Technology into Defendants' TrueTaste® Technology and Product to improve its products and services that before could not adequately compete with Zooming Technology.

222.    ZoomEssence has never authorized Defendants to use, possess, or disclose ZoomEssence's Trades Secrets outside the scope of the 2011 and 2019 NDAs.

223.    ZoomEssence relied on FONA's clear, unequivocal representations in 2017 that it did not breach the 2011 NDA or misappropriate any of ZoomEssence's Trade Secrets or other confidential information. As a result, ZoomEssence entered into the 2019 NDA with FONA to revisit a potential collaboration, and disclosed to FONA ZoomEssence's Trade Secrets and other confidential information relating to Zooming Technology.

224.    ZoomEssence reasonably relied upon Defendants' representations that they would adhere to its contractual confidentiality and limited use obligations to ZoomEssence. ZoomEssence did not discover Defendants' breach and misappropriation until 2025, when a former FONA consultant from a reverse-engineering firm notified ZoomEssence that, with the firm's help, Defendants had reverse-engineered ZoomEssence's Zooming Technology, and when it obtained definitive evidence that Defendants had implemented low-temperature spray drying, which necessarily incorporates ZoomEssence's misappropriated Trade Secrets.

225.    Defendants' breach and misappropriation was inherently undiscoverable because ZoomEssence could not have known of Defendants unlawful activities, even in the exercise of reasonable diligence. What's more, FONA agreed to be restricted by the 2019 NDA.

226.    Defendants have thus misappropriated, used, and threaten to continue to misappropriate and use ZoomEssence's Trade Secrets without authorization and, upon information and belief, with an intent to "beat" ZoomEssence's performance. Moreover, upon information and belief, Defendants have misappropriated Defendants' Trade Secrets to avoid investing time and effort in independently developing its own competing technology. Upon information and belief, additional misappropriation will be revealed through discovery.

227.    FONA knew or had reason to know that the misappropriated information was confidential and proprietary to ZoomEssence, constituted ZoomEssence's Trade Secrets, and that they were not authorized to use, possess, or disclose ZoomEssence's Trade Secrets outside the scope of the applicable NDAs. FONA also knew or had reason to know that ZoomEssence's Trade Secrets were acquired through improper means, and/or acquired under circumstances giving rise to a duty to maintain the secrecy or limit the use of ZoomEssence's Trade Secrets.

228.    Upon information and belief, McCormick knew or had reason to know that FONA was never authorized to use or disclose to McCormick any of ZoomEssence's Trade Secrets, and that FONA had acquired such information through improper means and/or had derived such information under circumstances giving rise to a duty to maintain the secrecy or limit the use of ZoomEssence's Trade Secrets.

229.    Defendants engaged in misappropriation with willful, malicious, and improper motives, and with reckless indifference to ZoomEssence's intellectual property rights.

230.    ZoomEssence has suffered and continues to suffer damages as a direct and proximate result of Defendants' misappropriation in an amount to be proven at trial.

## JURY TRIAL DEMANDED

231.    ZoomEssence respectfully requests a jury trial on any issues so triable by right.

## **PRAYER FOR RELIEF**

WHEREFORE, ZoomEssence respectfully requests that the Court enter judgment for Plaintiff and pray that the Court grant the following relief to Plaintiff:

A. A judgment that Defendant McCormick has directly and indirectly infringed one or more claims of the '527 Patent and the '776 Patent,

B. An award of damages adequate to compensate for McCormick's infringement of the Asserted Patents, including, but not limited to, lost profits and/or a reasonable royalty;

C. An award of damages for pre-issuance infringement activities under 35 U.S.C. § 154(d);

D. A preliminary and permanent injunction barring Defendants and their officers, directors, agents, servants, employees, affiliates, attorneys, and all others acting in privity or in concert with McCormick, and its parents, subsidiaries, divisions, successors, and assigns, from further acts of infringement of the Asserted Patents;

E. A judgment that McCormick's infringement of the Asserted Patents was and continues to be willful;

F. An award of treble damages under 35 U.S.C. § 284;

G. A declaration that this case is exceptional under 35 U.S.C. § 285 and an award of Plaintiff's attorneys' fees and costs;

H. A judgment that Defendants have misappropriated Plaintiff's Trade Secrets under 18 U.S.C. § 1836 *et seq.*;

I. A judgment that Defendants' misappropriation of Plaintiff's Trade Secrets was and remains willful and malicious;

J.  An award of damages adequate to compensate for Defendants' misappropriation of Plaintiff's Trade Secrets under 18 U.S.C. § 1836(b)(3)(B), including, but not limited to, damages for actual loss and unjust enrichment, or, alternatively, a reasonable royalty;

K.  An award of exemplary damages and attorneys' fees for Defendants' willful and malicious misappropriation of Plaintiff's Trade Secrets under 18 U.S.C. §§ 1836(b)(3)(C)–(D);

L.  A preliminary and permanent injunction enjoining and restraining Defendants and their officers, directors, agents, employees, affiliates, attorneys, and all others acting in privity or in concert with Defendants, and its parents, subsidiaries, divisions, successors, and assigns, from disclosing or using (directly or indirectly) any of Plaintiff's Trade Secrets and other confidential information under 18 U.S.C. § 1836(b)(3)(A);

M.  An order providing for the seizure of property necessary to prevent the propagation or dissemination of Plaintiff's Trade Secrets and other confidential information under 18 U.S.C. § 1836(b)(2);

N.  An order requiring Defendants to return to Plaintiff all of Plaintiff's Trade Secrets and other confidential information in Defendants' possession, custody, or control;

O.  An order prohibiting Defendants from engaging in business with ZoomEssence's current or former customers for which Defendants unlawfully solicited with misappropriated ZoomEssence Trade Secrets and other confidential information;

P.  An award of pre-judgment and post-judgment interest as provided by law; and

Q.  Such other further relief to which Plaintiff may be entitled or as the Court may deem appropriate.

DATED: December 19, 2025                    Respectfully submitted,


*/s/ Claire Abernathy Henry*
Claire Abernathy Henry
State Bar No. 24053063
claire@millerfairhenry.com
MILLER FAIR HENRY PLLC
1507 Bill Owens Parkway
Longview, Texas 75604
(903) 757-6400 (telephone)
(903) 757-2323 (facsimile)


Jonathan M. Watkins (*pro hac vice* forthcoming)
Michael B. Powell (*pro hac vice* forthcoming)
Cameron A. Kasanzew (*pro hac vice* forthcoming)
Caroline S. Grady (*pro hac vice* forthcoming)

CADWALADER, WICKERSHAM & TAFT LLP
200 Liberty St.
New York, NY 10281
T: (212) 504-6000
F: (212) 504-6666
Jonathan.Watkins@cwt.com
Michael.Powell@cwt.com
Cameron.Kasanzew@cwt.com
Caroline.Grady@cwt.com

***Attorneys for Plaintiff ZoomEssence, Inc.***